UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                                    :
SOON C. KIM,
                                    :
              Plaintiff,                        **MEMORANDUM DECISION**
                                    :
        - against -                             04 Civ. 2512 (DC)
                                    :
JO ANNE BARNHART,
Commissioner of Social Security,    :

              Defendant.            :

- - - - - - - - - - - - - - - - - -x


**APPEARANCES:**          FREEDMAN, WAGNER, TABAKMAN & WEISS
                          Attorneys for Plaintiff
                                By: David McRae Wagner, Esq.
                          130 North Main Street, Suite 202
                          New City, New York  10965

                          DAVID N. KELLEY, ESQ.
                          United States Attorney for the
                          Southern District of New York
                                By: Susan D. Baird, Esq.
                                    Assistant United States Attorney
                          86 Chambers Street
                          New York, New York  10007

**CHIN, D.J.**

        Plaintiff Soon C. Kim brings this action pursuant to 42

U.S.C. § 405(g), challenging the final decision of defendant

Commissioner of the Social Security Administration (the

"Commissioner" and the "SSA," respectively) that Kim was not

entitled to disability insurance benefits under the Social

Security Act (the "Act").  Plaintiff moves for judgment on the

pleadings, pursuant to Fed. R. Civ. P. 12(c), requesting that the

Court reverse the Commissioner's finding and remand the matter

with instructions to find Kim disabled for the period between

March 3, 1996 and February 15, 2002.  The Commissioner cross-

moves for judgment on the pleadings. For the reasons set forth below, plaintiff's motion is denied, defendant's motion is granted, the determination denying benefits is affirmed, and the complaint is dismissed.

## BACKGROUND

### A.   Prior Proceedings

_____Kim filed an initial Title II application for disability insurance benefits on January 13, 1997, alleging that she became disabled on March 3, 1996 due to work-related activities. (Tr. at 72-74).[1] The SSA denied the disability claim on March 18, 1997. (Id. at 58-60). Kim filed a request for reconsideration, which also was denied. (Id. at 61-65). On April 8, 1997, Kim appealed the SSA decision and requested a hearing before an Administrative Law Judge (the "ALJ"). (Id. at 66-68).

The ALJ considered the matter de novo at a hearing on February 23, 1998. Plaintiff appeared, represented by counsel, and testified. (Id. at 24). The ALJ, Christopher Lee, found that Kim was not disabled. (Id. at 10-14). Kim appealed the decision and this Court remanded the case pursuant to a stipulation of the parties. (Id. at 209-10). The SSA Office of Hearings and Appeals vacated the ALJ's decision and remanded the case for a new hearing, noting that the ALJ did not appropriately consider Kim's treating sources, and instructed the ALJ to update

_____

[1]   Page citations to "Tr." refer to the transcript of the administrative record.

the record and obtain additional information.  (Id. at 210-14).

        The ALJ held a new hearing on January 16, 2002 and
issued a decision finding the plaintiff was not disabled.  (Id.
at 202-07).  The ALJ's finding became the final decision of the
Commissioner when the SSA Appeals Council denied Kim's request
for review on March 22, 2004.  (Id. at 195-96; see 20 C.F.R.
404.984(b)(2)).

        Kim filed the instant action on March 31, 2004,
claiming a continuing disability as a result of her March 3, 1996
back injury and seeking an award for a period of disability
insurance benefits under the Act.  Kim filed moved for judgment
on the pleadings on October 22, 2004 and the Commissioner cross-
moved for judgment on the pleadings on February 5, 2005.

**B.   Evidence**

  **1.   Plaintiff's Age, Education, and Experience**

        Kim was born on April 25, 1937, and was sixty-five
years old at the time of the March 22, 2002 ALJ decision.  (Tr.
at 89).[2]  The onset date of her injury was February 29, 1996, and
Kim has not resumed work since March 3, 1996.  (Id. at 30, 32).

        Kim completed fifteen years of school in Korea,
including three years of nursing school; she did not receive any
vocational training in the U.S.  (Id. at 32).  Kim worked as a
practical nurse on the night-shift from January 23, 1978 until

_____

        [2]   Although there originally was some dispute over Kim's
date of birth (see Tr. at 27, 30, 203), the official translation
of Kim's Korean Birth Certificate indicates that April 25, 1937
is her date of birth.  (Id. at 86-89).

March 3, 1996, and has never done any other work. (<u>Id.</u> at 101, 256). According to Kim's testimony, her job responsibilities included paperwork, changing patients' intravenous drips, distributing medication, assigning duties to nurses' aides, transferring patients between beds and wheelchairs, and pushing oxygen tanks. (<u>Id.</u> at 32-33, 101-02). Kim indicated in a preliminary report that her daily responsibilities required that she walk for five hours per day, stand for four hours, and sit for approximately two hours. (<u>Id.</u> at 32, 102). A typical workday included constant bending, frequent reaching and lifting of up to ten pounds, and occasional lifting up to 50 pounds. (<u>Id.</u> at 102).

Kim injured her back while lifting a patient from a bed to a chair during the night-shift on February 29, 1996. (<u>Id.</u> at 30, 34-35). Prior to the February 29th incident, plaintiff did not have any back pain or injuries. (<u>See</u> <u>id.</u> at 148-67). Kim called in sick the day after the incident and stopped working altogether on March 3, 1996. (<u>Id.</u> at 97). Kim received Worker's Compensation benefits from February 29, 1996 until January 10, 1997. (<u>Id.</u> at 30). When the Worker's Compensation benefits ceased, Kim discontinued her medical treatment, although she could have received coverage under her husband's insurance. (<u>Id.</u> at 243). At the time of the hearing Kim was living in a house with her husband and daughter. (<u>Id.</u> at 28).

## 2. **Medical Evidence**

### a. **Treating Physicians**

#### i. **Dr. Lee A. Berk**

After the workplace incident, Kim sought a medical referral from her employer and began seeing Dr. Berk (id. at 35), an internist at the Health Insurance Plan of Greater New York Center ("HIP"). Dr. Berk recommended physical therapy and bed rest, advising plaintiff not to bend or lift anything. (Id. at 158). Dr. Berk also authorized a computerized tomography scan ("CT"). (Id.).

The CT, performed on March 6, 1996, revealed multiple disc bulges at L2-3, L3-4, L4-5, and L5-S1. (Id. at 159, 177). The CT revealed diffuse disc bulge without evidence of herniation or spinal stenosis. (Id. at 177). On March 21, 1996, Dr. Berk, after reviewing the CT results, concluded that Kim had low back pain syndrome and lumbosacral radiculopathy. (Id. at 159). Dr. Berk found that plaintiff could return to "light duty nursing" as long as she did not lift or bend. (Id.). The doctor noted, however, that Kim was "unclear about her desire [to] return to work." (Id.).

Dr. Berk examined plaintiff again on May 3, 1996, and found that "she still [could not] perform the duties required by RN," and reported that pain persisted in spite of bed rest and physical therapy. (Id.). During a June 26, 1996 visit, Kim reported weakness and numbness in her left foot, but Dr. Berk

found that Kim's right lower extremity had a strength of five out of five, and the left lower extremity had a strength of four out of five. (Id. at 157). Again, Dr. Berk concluded that the patient had lumbosacral radiculopathy. (Id.).

### ii. Dr. Hema Dave

Plaintiff underwent a physical examination by Dr. Dave, an osteopath, on January 15, 1997. (Id. at 168). Dr. Dave concluded that Kim was suffering from intervertebral disc and lower back syndrome and prescribed Oruvail and Tylenol 3, as well as the application of moist heat. (Id.). The doctor noted, however, that the patient was "in no acute distress." (Id.). While there was lumboscral tenderness, the patient appeared neurologically intact. (Id.). In a follow-up visit on March 19, 1997, Dr. Dave came to similar conclusions, but prescribed Elavil and Tylenol to aid in Kim's recurring back pain and the feeling of weakness in her legs. (Id. at 170).

### b. Consulting Physicians

### i. Dr. Paul Jones

Dr. Jones, an orthopedist, examined Kim for the Worker's Compensation Board in June and November of 1996. (Id. at 146-47). Dr. Jones concluded that Kim suffered lumbar syndrome, which was "causally related" to the workplace incident. (Id. at 147). Dr. Jones found that Kim suffered from a "moderate partial disability." (Id.). While noting Dr. Berk's conclusion that the patient's disability was total, Dr. Jones did not concur

in this finding.  (See id.).  Kim reported pain, but the tilting, twisting, and extension of her lower back were found to be normal.  (Id. at 146).

<u>                    ii.  **Dr. Michael Robinson**</u>

The SSA referred Kim to consulting physician Michael Robinson, who examined the patient on November 6, 2001, the most recent examination in the record.  (Id. at 230-32).  Dr. Robinson found that Kim had normal strength in all muscle groups, but there was breakaway weakness in the lower left extremity.  (Id. at 232).  Dr. Robinson noted that Kim's fine motor skills were within normal limits, but there were limitations on her lateral bending and lumbar motion.  (Id.).  Dr. Robinson's final impression was that Kim had chronic lumbar facet anthropathy with associated myofascial pain syndrome.  (Id.).  Kim would have "minimal limitations in regard to climbing, sitting, walking, standing, lifting and carrying and no significant limitations in regard to handling, hearing or speaking in light of her orthopedic impairment."  (Id.).

Dr. Robinson noted that plaintiff could perform activities of daily independent living and that her tendon reflexes were normal bilaterally.  (Id. at 231, 232).  While there was some evidence of breakaway weakness, sensation to touch and pin pick were intact.  (Id.).  Additionally, Kim reported some lower back pain during straight leg raising, but leg raises did not indicate radicular symptoms.  (Id. at 232).  Dr. Robinson opined that there would be no significant improvement to the

current condition based on plaintiff's response to treatment.
(Id.)

### c. **Residual Functional Capacity Assessment**

Three reviewing physicians completed Residual
Functional Capacity Forms as part of their patient assessment.
On February 23, 1997, an unsigned assessment concluded that the
patient could lift fifty pounds occasionally, twenty five pounds
frequently and could stand and sit for a total of six hours each
in an eight-hour day. (Id. at 125).

Dr. Wells, a state agency review physician, examined
the evidence and completed an assessment on April 23, 1997. (Id.
at 132-39). Dr. Wells concluded that Kim was able to
occasionally lift and carry up to fifty pounds, frequently lift
twenty-five pounds, and stand or walk or sit for six hours each
in an eight-hour workday. (Id. at 133). The primary diagnosis
was lumbar disc disease. (Id. at 132).

Dr. Naveed Siddiqi, another state agency physician,
reviewed the evidence on November 3, 1997[3] and found that Kim was
able to lift ten pounds frequently, twenty pounds occasionally,
and could stand and sit for six hours each in a typical workday.
(Id. at 117, 123). Dr. Siddiqi's primary diagnosis was back
disorder. (Id. at 116).

_____

[3] Dr. Sidddiqi's Residual Functional Capacity Assessment
was dated "11/3/87." It is the Court's understanding, however,
that the date should have read "11/3/97" in light of the facts,
and the Disability Determined filed by Dr. Siddiqi, showing the
1997 date. (See Tr. at 56).

### d. __Additional Medical Data__

Kim did not undergo any medical treatment for her back injuries between February, 1998 and April, 2000. She did continue to see her family physician, Dr. Richard King, who authorized a bone density study. A bone density study was conducted in April by Dr. Shari Siegel-Goldman. (<u>Id.</u> at 234, 236). The study revealed osteoporosis of the lumbar spine with an increased fracture risk. (<u>Id.</u>). A second study was completed on May 1, 2001, again suggesting an increased fracture risk, but also showing an increase in bone density since the April study. (<u>Id.</u> at 233, 236).

### 3. __Chiropractic Evidence__

#### a. __Raymond Esposito__

In addition to seeing medical doctors, Kim received bi-weekly treatment from chiropractor Raymond Esposito from September 7, 1996 until January, 1997. (<u>Id.</u> at 140, 179). Dr. Esposito filed a disability determination form on January 30, 1997, diagnosing Kim with lumbar intervertebral disc syndrome, sciatica, and myalsia. (<u>Id.</u> at 140, 179). Dr. Esposito's clinical findings state that Kim had muscle spasms, hypesthesia (decrease in sensation), and some atrophying. (<u>Id.</u> at 140-41, 179-80). Dr. Esposito issued a back support to aid in "household duties" and concluded that Kim was "total[ly] disabled and no work related activities should be attempted." (<u>Id.</u> at 142, 181). Additionally, Dr. Esposito found that plaintiff's ability to

stand or walk was limited to less than two hours a day and her ability to sit was limited to less than six hours per day, concluding that Kim should not do any pulling, pushing, or lifting.  (Id. at 143, 183).

Dr. Esposito reported that Kim had weakness in her left leg, favored her right leg when walking, and that the anterior/posterior cervical curve and lumbar curve were decreased.  (Id. at 143, 183).  All ranges of motion for the cervical spine were decreased, and the left side muscle groups showed weakness, but reflexes were present and normal.  (Id.). Dr. Esposito's orthopedic exams revealed back pain for almost all motion.  (Id. at 174-75).

### b.  **Medical Evidence Requested by Dr. Esposito**

On August 21, 1997, the results of a Magnetic Resonance Imaging ("MRI") ordered by Dr. Esposito showed that there was "disc desiccation from L2-3 down to and including L5-S1, associated with mild disc space narrowing."  (Id. at 173).  The MRI presented no evidence of herniation.  (Id.).  The multi-level disc changes were consistent with disc bulging shown in the 1996 CT scan.  (See id. at 159, 177).

On November 10, 1997, at the referral of Dr. Esposito, the patient underwent a neurological consultation with Dr. Irwin Librot.  (Id. at 186-88).  The testing revealed that there were "inconsistencies in motor power testing diffusely in the left arm and leg," that Kim felt pain when performing straight leg lifts, and that she had some hip pain.  (Id. at 187).  Additionally,

there was a diminished pin prick in the left arm and leg.  (Id.).
Kim's deep tendon reflexes were normal and symmetrical.  (Id.).
The overall impression was that Kim had chronic lumbosacral pain
and that an electro-diagnostic evaluation (an "EMG") should be
undertaken.  (Id.).  While there were not confirmatory findings,
the systems were "suggestive" and Dr. Librot recommended the test
to determine whether Kim suffered "some degree of demonstrable S1
radiculopathy."  (Id.).

        In February 1998, an EMG was conducted and Dr. Librot
concluded that the study was normal except for "questionable
findings in the left anterior tibialis," and "that there is still
a question as to why the patient has numbness over the left side
of the body."  (Id. at 191).  The overall impression was that the
results were normal.  (Id.).

    **4.**   **Plaintiff's Testimony**

       **a.**   **February 23, 1998 Hearing**

        Plaintiff testified that although she had never gone to
the hospital or had surgery recommended to her, she saw several
doctors who prescribed the following medicines at different
times:  Ultran, Tylenol 3, and Oluvail.  (Id. at 37-38).  Kim
explained that she had back pain when she sat for too long, and
often when she slept.  (Id. at 39).  She also claimed that she
could not stand or walk around for more than half an hour, but
could drive the approximately ten miles to her church.  (Id. at
44).  The limitations of Kim's motion precluded her from working
because her job required her to sit for about two hours in an

eight-hour workday and lift twenty-five pounds.  (Id. at 33-34).

Kim complained of sharp pains when sitting for more than half an hour and stated that the pain would last, requiring medication.  (Id. at 40).  The only way to alleviate the pain was to lie down.  (Id. at 40, 46, 48).  Kim also claimed that she could not walk ten blocks, but that she did walk for half an hour a day, in which time she could get around her house.  (Id. at 40).  While Kim testified that she could prepare lunch, her husband or daughter would cook dinner.  (Id. at 42).  She also testified that she did not sleep much and could not lift even a gallon of milk.  (Id. at 41).

### b.  January 16, 2002 Hearing

Kim presented the ALJ with the medications that doctors had prescribed to her: Ultram 50, Allpap with Codeine, Amitriptyline, Etodolac, and Celebrex.  (Id. at 245).  Kim stated that sitting for any period of time was painful and that she spent most of her time lying down.  (Id. at 247).  Additionally, Kim stated that she could walk for ten to fifteen minutes a day. She explained that even to dress was difficult, requiring her to kneel because she was unable to bend.  (Id. at 250-51).  The plaintiff explained that she had left-hand pain, related to her back, but that she was right-hand dominant.  (Id. at 249).

## DISCUSSION

## A.    Applicable Law

### 1.    The Disability Determination

A claimant is entitled to disability benefits under the Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be of such severity that the claimant

> is not only unable to do his previous work
> but cannot, considering his age, education,
> and work experience, engage in any other kind
> of substantial gainful work which exists in
> the national economy, regardless of whether
> such work exists in the immediate area in
> which he lives, or whether a specific job
> vacancy exists for him, or whether he would
> be hired if he applied for work.

Id. at § 423(d)(2)(A).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the
> [Commissioner] to determine whether the
> claimant is presently employed.  If the
> claimant is not employed, the [Commissioner]
> then determines whether the claimant has a
> "severe impairment" that limits her capacity
> to work.  If the claimant has such an
> impairment, the [Commissioner] next considers
> whether the claimant has an impairment that
> is listed in Appendix 1 of the regulations.

> When the claimant has such an impairment, the
> [Commissioner] will find the claimant
> disabled.  However, if the claimant does not
> have a listed impairment, the [Commissioner]
> must determine, under the fourth step,
> whether the claimant possesses the residual
> functional capacity to perform her past
> relevant work.  Finally, if the claimant is
> unable to perform her past relevant work, the
> [Commissioner] determines whether the
> claimant is capable of performing any other
> work.

Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999)(quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)).  The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step.  (Id.).

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts and clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability; and (4) claimant's educational background, age, and work experience."  (Id.)(citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Commissioner must grant controlling weight to a treating physician's assessment if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [it] is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); see Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).  The ALJ may not arbitrarily substitute his own judgment for the treating physician's competent medical opinion.

See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999).

When the treating physician's opinion is not given controlling weight, the ALJ must consider various "factors" to determine how much weight to give to the opinion, and set forth his reasons for the weight assigned to the treating physician's opinion.  20 C.F.R. § 404.1527(d)(2).[4]

## 2.  **Standard of Review**

A court may set aside the Commissioner's decision to deny disability benefits only when it is based on legal error or is not supported by substantial evidence.  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  Substantial evidence means "more than a mere scintilla" -- it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997) (internal quotations and citations omitted).  A district court's review of the Commissioner's determination, therefore, is limited to "whether the Commissioner applied the proper legal standards, whether its factual findings were supported by substantial evidence, and whether [he] provided a full and fair hearing."  Saul v. Apfel, No. 97 Civ. 1616 (DC), 1998 WL 329275, at *3 (S.D.N.Y. June 22, 1998).

---

[4]    These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the SSA's attention that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2).

The Commissioner's decision is to be afforded considerable deference; the reviewing court should not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). In reviewing a decision denying disability benefits, the Court "must regard the [Commissioner's] factual determinations as conclusive unless they are unsupported by substantial evidence." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) (discussing 42 U.S.C § 405 (g)). Although the ALJ has the duty to develop the record and cannot make findings independent of the record, Rosa, 168 F.3d at 77, there is no requirement that the ALJ "mention[] every item of testimony presented to him" or "explain[] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983)(discussing Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)("although we would remand for further findings or a clearer explanation where we could not fathom the ALJ's rationale 'in relation to evidence in the record,' we would not remand where 'we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'")); see also Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981)("[n]otwithstanding the apparent inconsistency between the reports of [two doctors], we

are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony.").

**B.   Application**

Kim claims that the Commissioner's decision was not supported by substantial evidence because the ALJ erroneously applied the "treating physician rule."  (Pl. Mem. at 1).  Kim acknowledges that a chiropractor is a medical source whose opinions are not entitled to controlling weight, but claims that the ALJ acted in error by not giving Raymond Esposito's opinion any weight, and by "failing to utilize all of the medical evidence that was favorable to the claimant in the record."  (Id. at 3).  The ALJ did not recognize, according to plaintiff, that the chiropractor's findings were "consistent with the entire record" and thus failed to give the opinion due regard.  (Id. at 7-8).

Kim also claims that the ALJ failed to consider relevant evidence and instead "focus[ed] on what the diagnostic tests failed to show, rather than the positive findings that [the EMG, CT scan, MRI] showed," thus ignoring "numerous exhibits."  (Id. at 5).  Kim contends that this failure to examine test results aided in the finding that Dr. Esposito's determinations were inconsistent with other evidence, and resulted in the ALJ's reliance on consultive physicians rather than the treating doctors.  (Id. at 8).  Specifically, plaintiff argues that the ALJ did not give due weight to the opinions of Dr. Mathisson or Dr. Dave and relied on the reports of Dr. Jones, "failing to

consider the frequency of examination and the length, nature and extent of the treatment relationship of these doctors" as required by Federal regulation.  (Id.).

I turn first to Kim's argument that the "treating physician rule was misapplied."  I disagree.  The treating physician rule does not apply to chiropractors.  Diaz v. Shalala, 59 F.3d 307, 313 (2d Cir. 1995).  While the regulations provide that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a patient's] impairment(s)," 20 C.F.R. § 404.1527 (a)(2), the list of "acceptable medical sources" does not include chiropractors.  See 20 C.F.R. § 404.1513(a).  Instead, chiropractors are listed in a section labeled "other sources" whose "[i]nformation . . . may also help . . . to understand how [a patient's] impairment affects [her] ability to work."  20 C.F.R. § 404.1513(e). "Because the regulations do not classify chiropractors as either physicians or 'other acceptable medical sources,' chiropractors cannot provide medical opinions."  Diaz, 59 F.3d at 313.  Hence, Kim's reliance on the treating physician rule is misplaced.

Alternatively, even if Dr. Esposito were a medical doctor and considered a "treating physician" for the purposes of the regulations, the "treating physician rule" does not apply when the treating physician's opinion is inconsistent with the other substantial evidence in the record, such as the opinions of other medical experts.  Halloran v. Barnhart, 362 F.3d 28, 32 (2d

Cir. 2004); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002). The ALJ was under no duty to accord special weight to Esposito's opinion, but was required only to look at his opinion in light of the entire record. Moreover, the results of the tests requested by Esposito undermined his own opinion. See supra, at 10-11.

Likewise, plaintiff's argument that the ALJ ignored evidence in the record is unavailing. While the ALJ did not specifically mention the reports of Drs. Dave and Matthison, he was under no duty to do so. These individual reports are neither conclusive nor contradictory to the ALJ's findings. The medical evidence, taken in totality, supports the conclusion that Kim's injury was not severe. By January of 1997, Dr. Dave reported that Kim was in no acute distress. (Id. at 168). In November of 2001, Dr. Robinson noted only minimal exertional limitations existed. (Id. at 232).

In determining the validity of Kim's claim, the ALJ properly proceeded through the five steps outlined in Brown. See 174 F.3d at 62. The ALJ first determined that the plaintiff had not worked since the date of her back injury, March 3, 1996. (Tr. at 203). Second, the ALJ determined that the claimant suffered "severe" back impairment, but that the disability was not severe enough to equal the impairments listed in 20 C.F.R. § 404 Appendix 1, Subp. P, App. 1. (Id. at 203).

There is substantial evidence in the record that supports the finding that Kim did not suffer a significant

limitation in motion. While she testified that she suffered constant pain and could not lift a gallon of milk (id. at 41), the medical reports by treating and consultative physicians, as well as the residual function reports and disability determinations, all stated that Kim suffered minimal limitations. Only Dr. Esposito opined that plaintiff should refrain from all lifting, while the more recent doctors' opinions concluded instead that limitations were minimal. (Id. at 159, 231). Finally, even if Dr. Esposito's findings were given dispositive weight, there would be no proof that Kim's symptoms met the durational requirement of the regulations: Esposito's last evaluation of the plaintiff was in January 1997, short of the twelve month statutory requirement. See 42 U.S.C. § 423(d)(1)(a) ("disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than 12 months.").

Because the ALJ made a finding of severe impairment, he was required to determine whether Kim retained the residual functional capacity to perform the requirements of past relevant work or other work existing in the national economy. Residual functional capacity is "the most [an individual] can still do considering [physical and mental] limitations." 20 C.F.R. § 404.1545.

In his determination that Kim retained the residual functional capacity to continue to work at a medium exertional level,[5] the ALJ specifically discussed the medical opinions of Drs. Jones, Robinson, and Esposito. (Tr. at 205). The ALJ also made reference to the bone density study conclusions and consultive examination findings that Kim suffered only minimal exertional limitations. (Id. at 205).

The ALJ's conclusion also is supported by the Residual Functional Capacity Assessments in the record. On February 28, 1997, Dr. Berk found that Kim could lift fifty pounds occasionally, twenty-five pounds frequently, and stand and sit for six hours in a day. (Id. at 125). On April 23, 1997, Dr. Wells made the same determination. (Id. at 133).

The ALJ referred generally to the objective clinical report findings that there was no proof of more than a mild narrowing of disc space, and no finding of herniation or spinal stenosis. (Id. at 205). Additionally, the ALJ took into account the fact that Kim had not been hospitalized and that no practitioner recommended surgery, using this evidence to support a finding that Kim's injuries were limited. (Id.).

The ALJ has the discretion to evaluate the credibility of a claimant and to make an independent judgment based on medical findings, regarding the true extent of the claimant's

_____

[5]     Medium work is defined as "involv[ing] lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567.

pain. <u>Mimus v. Heckler</u>, 750 F.2d 180, 186 (2d Cir. 1984). The ALJ did not find Kim's subjective complaints credible because they were not supported by a preponderance of the evidence. (Tr. at 205). Kim was not taking any strong narcotic medication and she was able to drive short distances and perform the daily tasks of living. (<u>Id.</u>).

After reviewing the record, I find that the ALJ properly applied the governing law in determining the denial of SSA benefits. The ALJ concluded that Kim retained the functional capacity to perform her duties as a nurse as generally performed in the national economy based on an examination of the entire record and relevant facts. Substantial evidence supports the Commissioner's finding that Kim was capable of performing work at a medium level of exertion, including her previous gainful employment.

### CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the pleadings is granted and the final determination of the Commissioner is affirmed. Plaintiff's motion for remand is denied. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

Dated:     New York, New York
           May 9, 2005

                                    _____
                                    DENNY CHIN
                                    United States District Judge